First National Industries, Inc. v. Commissioner.
First Nat'l Industries, Inc. v. Commissioner
Docket No. 389-63.
United States Tax Court
T.C. Memo 1967-136; 1967 Tax Ct. Memo LEXIS 124; 26 T.C.M. (CCH) 608; T.C.M. (RIA) 67136; June 23, 1967
William Waller, 12th Fl., American Trust Bldg., Nashville, Tenn., for the petitioner. Vallie C. Brooks, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies *125 in petitioner's income tax for the fiscal years ended January 31, 1957, and January 31, 1959, in the amounts of $8,324.21 and $152,024.93, respectively. The deficiency for the year 1957 results from the disallowance of a claimed net operating loss carryback from the fiscal year 1959 to the fiscal year 1957, which claimed carryback loss had been tentatively allowed. The issue for decision is whether petitioner realized a long-term capital gain in its fiscal year ended January 31, 1959, on the disposition of its interest in 1,000 shares of stock of B. G. Wholesale, Inc. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, a corporation organized under the laws of Delaware on February 2, 1955, had its principal office at the date of the filing of the petition in this case at Nashville, Tennessee. It filed its corporate Federal income tax returns for its fiscal years ended January 31, 1957, and January 31, 1959, with the district director of internal revenue, Nashville, Tennessee. Petitioner was organized to engage in the investment and rental business and since its incorporation, its principal place of business has been in Nashville, *126 Tennessee. Petitioner computes its taxable income under an accrual method of accounting, and it used such method in reporting its taxable income on its Federal income tax returns for the fiscal years ended January 31, 1957, and January 31, 1959. During the taxable years ended January 31, 1957, and January 31, 1959, petitioner had outstanding 35,200 shares of common stock, 22,340 shares of which were owned by First National Company and 85 shares by G. L. Comer (hereinafter sometimes referred to as Comer). Franklin Garment Company, Huffines Shirt Company, Merchants Warehouse Company, and Jobbers Manufacturing Company owned 35, 505, 3,755, and 8,480 shares, respectively. All of the common stock of Jobbers Manufacturing Company was owned by First National Company and all of the common stock of First National Company was owned by Church of Christ Foundation, Inc. All of the outstanding stock of Franklin Garment Company and of Huffines Shirt Company was owned by Merchants Warehouse Company, and all of the outstanding stock of Merchants Warehouse Company was owned by Comer. Church of Christ Foundation, Inc. (hereinafter sometimes referred to as the Foundation) was organized in 1946 as *127 a nonprofit corporation under the laws of the State of Tennessee by G. L. Comer, M. B. Comer, L. H. Jones, F. A. Berry, and J. C. Shacklett. By letter dated January 5, 1948, respondent ruled that the Foundation was exempt from tax under section 101(6), I.R.C. of 1939. By letter dated March 6, 1961, the Chief, Exempt Organizations Branch, Tax Rulings Division of the Internal Revenue Service, advised the Foundation that the Service was proposing to issue a ruling holding that the Foundation was not exempt under section 501(c)(3), I.R.C. 1954. By letter dated November 14, 1961, the Director of the Tax Rulings Division of the Internal Revenue Service advised the Foundation that its exemption had been revoked retroactively to the year 1955. In addition to the common stock of First National Company, all of which as heretofore stated was owned by the Foundation, First National Company had issued and outstanding 42,600 shares of preferred stock of a par value of $100. This preferred stock was nonvoting and provided for a 4 percent noncumulative dividend. Twenty-six thousand seven hundred shares of the preferred stock of First National Company were owned by corporations *128 which were owned directly or indirectly by the Foundation. These corporations and the number of shares of stock owned by each were as follows: No. of Shares
Company
of Stock
Allen Garment Company
2,900
Blue Ridge Shirt Manufacturing Com-
pany
2,033
Church of Christ Foundation
1,845
Cookeville Shirt Company
1,835
Heavy Duty Manufacturing Company
555
Kentucky Pants Company
2,135
Lebanon Garment Company
2,250
Mammoth Cave Garment Company
1,455
McMinnville Garment Company
4,090
Milan Shirt Manufacturing Company
2,250
John S. Naylor Company
4,350
Transfer Parking Station
82
Winchester Manufacturing Company
920
Total
26,700 The remaining 15,900 shares of preferred stock of the First National Company were owned by corporations owned and controlled directly or indirectly by Comer. These corporations and the number of shares owned by each were as follows: No. of Shares
Company
of Stock
Comer Realty Company
5,750
Franklin Garment Company
1,750
Charles Loridans Building Corpora-
tion
5,000
Merchants Warehouse Company
3,400
Total
15,900
Comer is president of Washington Manufacturing Company and some of its subsidiaries *129 or affiliated corporations. The majority of the outstanding common stock of the Washington Manufacturing Company during the years here in issue was owned by R. W. Comer and Sons Trust. Comer was trustee of the R. W. Comer and Sons Trust and as such managed and controlled the investments of that trust. In 1944 Comer contacted an individual by the name of Ervin G. Houchens (hereinafter referred to as Houchens) with respect to the two of them jointly acquiring a wholesale business in Bowling Green County. At the time Houchens was operating 13 or 14 stores and had a warehouse supplying these stores. A company by the name of National Stores owned at that time three or four stores. As a result of further discussions between Houchens and Comer, the two of them organized a corporation known as B. G. Wholesale, Inc. Comer paid cash in the amount of $100,000 as his capital contribution and the corporation from these funds acquired the wholesale business at Bowling Green and the stores operated by National Stores. Houchens transferred the 13 or 14 stores he was operating together with the merchandise in those stores to B. G. Wholesale, Inc., which was credited on the corporation books as a *130 capital contribution in the amount of $100,000. One-half of the common stock of B. G. Wholesale, Inc., consisting of 1,000 shares was issued to Houchens, and the other one-half was issued at the direction of Comer to corporations which he owned. From the time of its incorporation in 1944 throughout the years here in issue, B. G. Wholesale, Inc., operated its retail grocery stores under the name of Houchens Markets. The first several years of operation of B. G. Wholesale, Inc., resulted in little profit, but thereafter the business began to expand and the profits increased so that by around the third year of its operation dividends were being paid on its stock. From the time B. G. Wholesale, Inc., was incorporated throughout the years here in issue Houchens was in complete control of the management and operation of the business, and Comer or his corporations took no part in the business operation but were merely stockholders. When Comer and Houchens organized of them became dissatisfied with the arrangement, there would be either a division of the business or one or the other of the parties would propose a "buy or sell proposition." It was understood that Houchens would not *131 transfer his stock and that Comer would not transfer his stock other than to corporations which he owned or controlled either directly or indirectly without offering the stock for sale to the other stockholder. Approximately 2 years after B. G. Wholesale, Inc., was organized, Houchens discussed with Comer the possibility of his purchasing the stock held by Comer's interests but no decision was reached. Around 1956 Houchens again proposed purchasing the stock of B. G. Wholesale, Inc., issued to Comer's interests and at this time Comer at first told Houchens he would sell his stock. Houchens proceeded to investigate arrangements for financing the purchase of the stock and received a tentative commitment for a bank in Nashville to finance the purchase. However, prior to any consummation of the transaction, Comer decided he would not sell the stock to Houchens. From the time somewhere around 1956 until approximately the first of May 1958, there were no further discussions between Comer and Houchens with respect to Houchen's purchase of the B. G. Wholesale, Inc., stock. Sometime after the discussion in 1956, the B. G. Wholesale, Inc., stock had been listed with a brokerage firm in Nashville, *132 Tennessee, in order to determine what price might be obtained for all of the stock. Sometime shortly before May 1, 1958, Houchens began to discuss with E. H. Hatcher (hereinafter referred to as Hatcher) the purchase of the B. G. Wholesale, Inc., stock from the Comer interests. Hatcher is an accountant who has been employed since approximately 1926 by Washington Manufacturing Company and has done work for that company as well as other companies in which Comer has an interest. He was, during the years here involved, treasurer and a director of petitioner and has kept petitioner's books from the time of its organization throughout the years here involved. During the period involved in this case he was assistant secretary and director of First National Company, a trustee of the Foundation, assistant secretary and treasurer of Blue Ridge Shirt Manufacturing Company, and a director of the Dixie Manufacturing Company and of Mammoth Cave Garment Company. He supervised the accounting of the Foundation, First National Company, Blue Ridge Shirt Manufacturing Company, Dixie Manufacturing Company, Mammoth Cave Garment Company, and Huffines Shirt Company. Blue Ridge Shirt Manufacturing Company, *133 Dixie Manufacturing Company, Mammoth Cave Garment Company, and Huffines Shirt Company were garment manufacturers who leased machinery from petitioner. First National Company is a holding company and owns numerous subsidiary companies. During the years here in issue the only company from which Hatcher received a salary or other compensation was the Washington Manufacturing Company. On June 25, 1948, the 1,000 shares of B. G. Wholesale, Inc., stock which had originally been transferred to several of the corporations controlled by Comer were transferred to First National Company which on that date was owned by Comer. On November 30, 1950, First National Company transferred the 1,000 shares of B. G. Wholesale, Inc., stock to Merchants Warehouse Company for $100,000. Merchants Warehouse Company was also owned by Comer. On March 22, 1955, Merchants Warehouse Company transferred the 1,000 shares of B. G. Wholesale, Inc., stock to petitioner for $100,000. On December 10, 1957, petitioner obtained a loan of $750,000 from the First American National Bank in Nashville, Ennessee, executing a promissory note in that amount payable to the bank secured by the pledge of the 1,000 shares of *134 common stock in B. G. Wholesale, Inc., which it had acquired in 1955. Petitioner's books and records reflect that the 1,000 shares of B. G. Wholesale, Inc., stock acquired in 1955 were donated by petitioner to the Foundation on February 28, 1958. On that date a special meeting of petitioner's board of directors was held and the minutes of that meeting reflect that the following resolution was passed unanimously: RESOLVED, that this corporation donate to Church of Christ Foundation, Inc. Certificate No. representing 1,000 shares of the common stock, having a par value of $100.00 a share, in B. G. Wholesale Company, Inc., a Kentucky corporation; and further RESOLVED, that the President or a Vice President and the Secretary or an Assistant Secretary endorse said certificate for transfer, affixing thereto necessary revenue stamps, and when so endorsed and stamped, deliver the same to the Officers of Church of Christ Foundation, Inc., taking the receipt of such Officers for said certificate of stock. If said shares are represented by more than one certificate, then all certificates aggregating 1,000 shares shall be endorsed and delivered; and further RESOLVED, that notice of this *135 donation be at once given to the Stockholders of this corporation. On February 28, 1958, a special meeting of the trustees of the Foundation was held at which a resolution was passed pledging the 1,000 shares of capital stock of B. G. Wholesale, Inc., with the First American National Bank of Nashville, Tennessee, to secure the indebtedness of petitioner. The minutes of this meeting read in part as follows: The Chairman then stated that on the 28th day of February, 1958, First National Industries, Inc. donated to this Corporation 1,000 shares of the common capital stock, having a par value of $100.00 each, of B. G. Wholesale, Incorporated of Bowling Green, Kentucky, and that said shares had been transferred into the name of this corporation and were represented by Certificate No. 21. The Chairman further stated that First National Industries, Inc. was indebted to First American National Bank of Nashville for borrowed money evidenced by a note in the amount of $650,000.00, and this stock is held by them to secure this note. Since this corporation owned 87% of the capital stock of First National Industries, Inc. he felt it was for the best interest of this corporation to continue *136 to use the said 1,000 shares of stock with said Bank to secure said indebtedness of its subsidiary. After a full discussion, it was, on motion duly seconded, unanimously. RESOLVED, that this corporation pledge to First American National Bank of Nashville 1,000 shares of the common capital stock of B. G. Wholesale, Incorporated, a Kentucky corporation, evidenced by Certificate No. 21, and that such pledge be on the terms and conditions set out in the collateral form note now in use by said bank; and further RESOLVED, that the President or a Vice President and the Secretary or Assistant Secretary have prepared and execute an irrevocable power of attorney for transfer of stock in reference to said shares of stock with the same to be in blank and to deliver said power of attorney together with said certificate of stock to said First American National Bank of Nashville; and further RESOLVED, that said officers are authorized and empowered to waive notice of any renewals or extensions of said note or execution of notes in payment of interest thereon, and generally to pledge said shares of stock for the security of said indebtedness of First National Industries, Inc. Petitioner's *137 books reflect that on March 12, 1958, it paid $100,000 on the $750,000 note to the First American National Bank of Nashville, tennessee, and renewed the note for $650,000. The 1,000 shares of stock in B. G. Wholesale, Inc., had been assigned a value of $900,000 on the books of the Foundation and credited by the Foundation to donated surplus. Houchens had had no objection to petitioner's transferring the 1,000 shares of B. G. Wholesale, Inc., stock to the Foundation since in his view this was not a transfer of the stock outside of organizations controlled by Comer. On May 1, 1958, after a discussion between Hatcher and Comer wherein Hatcher stated that from the standpoint of the Foundation it would be advantageous to have as high a dividend as feasible declared on the B. G. Wholesale, Inc., stock but that in his discussion with Houchens, the latter had stated that in his opinion the money should be kept in B. G. Wholesale, Inc., for expansion, Comer instructed Hatcher to negotiate some form of agreement with Houchens with respect to the stock. Under date of May 3, 1958, Hatcher prepared on the Foundation stationery a letter to Houchens which read as follows: We are authorized *138 to advise you that the terms on which we would be willing to have our 50% of the Common stock of B. G. Wholesale, Inc. and Subsidiaries retired have been approved on the basis we discussed, as follows: B. G. Wholesale, Inc. would retire our stock at 50% of the consolidated book value as of May 31, 1958 plus $300,000.00. Terms of payment 30% in cash. Balance payable over a five (5) year period, if needed. Interest on unpaid balance at the rate of 5% per annum. Unpaid balance can be paid in full any time after December 31, 1958 if you desire. Although no additional Federal income taxes are anticipated, it is understood that book value of May 31, 1958 would later be adjusted for any such contingency and any other undisclosed liabilities or assets. We believe this covers the substance of our discussion and details can be spelled out when formal contract is executed. We will appreciate written notification if you care to accept the proposal above outlined. The above offer will remain open until May 10, 1958. On May 8, 1958, Houchens addressed a letter to the Foundation to the attention of Hatcher, trustee, which read as follows: This letter will constitute my rejection *139 of your offer of sale of 50% of the stock of the B. G. Wholesale, Inc., which offer was set for the in your letter of May 3, 1958. As a counter-offer I am proposing to sell to you the 50% of the common stock of B. G. Wholesale, Inc., owned by myself, Gilbert Biggers and Covella H. Biggers, under the same terms and conditions as set forth in your letter of May 3, 1958, with the exception that we shall retain as our exclusive property the trade name of "Houchens" and "Houchens, Inc.", and all brand names now used by the Houchens stores and markets. This counter-offer will remain open for your acceptance until May 17, 1958, at 12:00 noon and may be accepted by your notifying me in writing. After receiving Houchens' letter of May 8, 1958, Hatcher investigated certain sources of obtaining lines of groceries for the various stores, and after determining that such sources were available telephoned Houchens to inform him that the offer set forth in his letter of May 8, 1958, was acceptable to the Foundation. During this telephone conversation Houchens requested Hatcher to withhold acceptance of the offer contained in Houchens' letter of May 8, 1958, until the matter could be discussed *140 with the board of directors of B. G. Wholesale, Inc. On May 13, 1958, Houchens addressed a letter to the Foundation for the attention of Hatcher, trustee, on stationery of B. G. Wholesale, Inc., signed in the name of B. G. Wholesale, Inc., by Houchens as president, which read as follows: We wish to withdraw our offer to sell our 50% of the Common Stock of the B. G. Wholesale, Inc., which offer was set forth in our letter of May 8, 1958. We hereby accept your offer to retire your 50% of the Common Stock of the B. G. Wholesale, Inc., as set forth in your letter of May 3, 1958, excepting that the unpaid balance shall be payable annually in an amount of not less than 50% of the net earnings of the Corporation, after taxes but before depreciation, with the Corporation reserving the right to pay all or any portion of the unpaid balance after May 31, 1959, with the unpaid balance bearing interest at the rate of 5% per annum, provided that we may purchase the 50% of the Common Stock of the Houchens Warehouse Corporation at Book Value as of May 31, 1958, which, according to stock record book, is owned by Merchants Warehouse Corporation; terms, cash upon determination of book value by *141 auditors. You may proceed to have your attorney draw contract for our approval. On May 27, 1958, Houchens as president of B. G. Wholesale, Inc., the Foundation by Paul A. Hargis, Vice President, and the First American National Bank of Nashville, Tennessee executed a contract wherein B. G. Wholesale, Inc. agreed to redeem the 1,000 shares of its common stock held by the Foundation for a consideration of one-half of the consolidated book value of the outstanding stock of B. G. Wholesale, Inc., as of the close of business on May 31, 1958, plus the sum of $300,000. B. G. Wholesale, Inc., kept its books and records on the basis of a fiscal year ended May 31, and for this reason the contract was made effective as of May 31, 1958. Under the contract the agreed redemption price, which after the closing of the books was determined to be $955,374.29, was to be paid with a cash downpayment on or before June 16, 1958, of $250,000, and the balance to be evidenced by a promissory note of B. G. Wholesale, Inc., bearing interest at 5 percent. The contract further provided for the note being payable to the First American National Bank of Nashville, Tennessee as escrow agent and to be delivered *142 to the bank with a copy of the contract executed by the three parties. The contract also provided for holding the stock in escrow until such time as the note was paid. The minutes of a special meeting of the trustees of the Foundation held September 23, 1958, state the following: The Chairman then stated that at a former meeting of this Board of Trustees, held February 28, 1958, Resolutions were passed pledging 1,000 shares of the common capital stock of B. G. Wholesale, Inc., of Bowling Green, Kentucky, with First American National Bank of Nashville, to secure indebtedness of First National Industries, Inc.; that this corporation owned 87% of the capital stock of First National Industries, Inc., and the Chairman thought it was the best interest of this corporation to support its subsidiary in any way possible; that subsequent to said meeting, said 1,000 shares of stock had been sold and a Promissory Note for $705,374.29 had been executed by B. G. Wholesale, Inc., dated May 31, 1958, payable in five equal annual installments beginning June 30, 1959, which Note was payable to American National Bank of Nashville, Tennessee as escrow agent. The Chairman called attention [to the fact] *143 that the correct name of the escrow agent was First American National Bank of Nashville but that he felt it was immaterial and the Note was accepted in this form as it was acting as escrow agent for this corporation. The Chairman further stated that First National Industries, Inc. was still indebted to First American National Bank of Nashville and desired to furnish security with that bank, and he suggested that this Board of Trustees authorize the pledging of said Note to secure any and all indebtedness now owing or hereafter created by Firstnational Industries, Inc. to First American National Bank of Nashville. After a full discussion, it was, on motion duly seconded, unanimously RESOLVED, that this corporation cause to be pledged to First American National Bank of Nashville that certain Note dated May 31, 1958, in the principal amount of $705,374.29, executed by B. G. Wholesale, Inc., payable to American National Bank of Nashville, Tennessee, as escrow agent, for Church of Christ Foundation, Inc., in five annual installments, with the first installment being due June 30, 1959, which Note bears interest at the rate of 5% per annum until paid, with interest being payable at the *144 same time as principal; and further RESOLVED, that First American National Bank of Nashville, as escrow agent, using the name American National Bank of Nashville, Tennessee, be and it hereby is directed, authorized and empowered to endorse the aforesaid Note as escrow agent without recourse on itself, either individually or as escrow agent, and deliver the said Note to the commercial department of First American National Bank of Nashville, to be held by it in accordance with the pledge agreement set out on its ordinary form of Promissory Note for the security of any and all indebtedness to it of First National Industries, Inc. now owing or hereafter created, and that this pledge continue until all indebtedness of First National Industries, Inc. is paid in full, but in the event of default with the right of said bank to proceed to collect said Note in any manner provided by law and apply the proceeds to the payment of said indebtedness; and further RESOLVED, that the President or a Vice President, and the Secretary or an Assistant Secretary, give to First American National Bank of Nashville, in the name of this corporation, such instructions as said bank may request and confirm such *145 instructions from time to time thereafter at the request of said bank, and do all other things necessary or proper to fully pledge said Note with said bank as security for indebtedness of First National Industries, Inc. The books and records of the Foundation reflect that on June 19, 1958, it received $250,000 in cash from B. G.Wholesale, Inc., and on the same day paid $250,000 in cash on its indebtedness of $452,927.40 to First National Company. On June 19, 1958, the records of First National Company show that that company made payments on its indebtedness to Blue Ridge Shirt Manufacturing Company, Dixie Manufacturing Company, Mammoth Cave Garment Company, and McEwen Manufacturing Company in the respective amounts of $50,000, $100,000, $50,000 and $50,000. During the years involved in this case First National Company owned all the outstanding stock of these four corporations. Petitioner's books and records reflect that on June 19, 1958, it received from Blue Ridge Shirt Manufacturing Company, Dixie Manufacturing Company, Mammoth Cave Garment Company, and McEwen Manufacturing Company, payments in the respective amount of $50,000, $100,000, $50,000 and $50,000 to be applied to *146 the indebtedness of those companies to petitioner. Petitioner's records also reflect that on June 19, 1958, it paid $250,000 on its note to the First American National Bank of Nashville, Tennessee, secured by the 1,000 shares of common stock of B. G. Wholesale, Inc., thus reducing this note to $400,000. Petitioner's records further reflect that on October 9, 1958, it executed a new note to the First American National Bank of Nashville, Tennessee in the amount of $700,000, consolidating the $400,000 note renewed on June 18, 1958 with another note of $300,000 and receiving $100,000 of newly borrowed cash. On March 5, 1959, the First American National Bank of Nashville, Tennessee purchased the promissory note of B. G. Wholesale, Inc., dated May 31, 1958, in the amount of $705,374.29 for the face amount of the note plus interest thereon in the amount of $27,235.29; and on this same date the Foundation recorded on its books and records receipt of a cash payment in these two amounts. On this same day, the Foundation recorded on its records an advance of $700,000 to First National Company. The records of First National Company show that on March 5, 1959, it paid on its indebtedness to *147 Dixie Manufacturing Company, Mammoth Cave Garment Company, and McEwen Manufacturing Company, the respective amounts of $200,000, $300,000, and $200,000, and the records of petitioner show that on March 5, 1959, it received payments from those same three companies in the respective amounts of $200,000, $300,000, and $200,000 to be applied to the indebtedness of those companies to petitioner. Petitioner's records further reflect that on March 5, 1959, petitioner paid $700,000 on its note to the First American National Bank of Nashville, Tennessee. The 1,000 shares of common stock in B. G. Wholesale, Inc., pledged to the First American National Bank of Nashville by petitioner on December 10, 1957, as collateral on its note of $750,000 was assigned to the bank in negotiable form and continued to be so assigned as collateral for petitioner's indebtedness to the bank until March 5, 1959, when petitioner's outstanding note of $700,000 was paid. On March 5, 1959, the stock was released from petitioner's account and transferred to the liability account of B. G. Wholesale, Inc., as collateral on its note of May 31, 1958, which the bank had purchased on March 5, 1959. The stock was released *148 by the bank to B. G. Wholesale, Inc., on July 5, 1962, when that corporation's note was paid in full. The books and records of petitioner and the other companies owned or controlled by Comer or the Foundation with which it had transactions as heretofore set out were kept in the ordinary courses of the respective businesses of those corporations and the various entries were made in the ordinary courses of business of those corporations. These corporations had intercompany transactions which resulted in indebtedness arising among them and these corporations also customarily borrowed from or made advances to each other. Amounts shown as indebtedness of one corporation to another corporation on the various corporate books were the results of these intercompany transactions or loans. The revenue agent who examined the books and records of the Foundation and of petitioner and of a number of the other corporations referred to in these findings found the books and records of the various corporations in excellent shape and found intercompany transactions meticulously reported. He found no attempt to cover up or hide any transactions. Payments by one of the various companies to another of *149 those companies, including those heretofore set out, were made by checks drawn on the bank account of the company making the payment. Commencing in 1957 B. G, Wholesale, Inc., was paying dividends of 25 percent on its outstanding stock. The dividends on the 1,000 shares of stock owned by petitioner at that time thus amounted to $25,000. During the years 1954 through 1958 the Foundation had made contributions to various religious, charitable, and educational organizations in a total amount of approximately $116,000 in excess of the donations which had been made to the Foundation. Petitioner on its Federal income tax return, filed for its fiscal year ended January 31, 1959, reported as taxable income before special deduction, a loss of $43,445.97 and showed a special deduction for partially taxexempt interest in an amount of $5,779.54 with a resulting loss of $49,225.51. Petitioner took no deduction for contributions or gifts in the computation of its loss but on schedule H it showed under the designation, "Contributions or Gifts Paid," an amount of $100,000 as an amount paid to the Church of Christ Foundation, and on schedule M, "Reconciliation of Taxable Income and Analysis of *150 Earned Surplus and Undivided Profits," it showed as contributions in excess of 5 percent limitation the amount of $100,000. On April 15, 1959, petitioner filed an application for a tentative carryback adjustment for the loss of $49,225.51 reported on its Federal income tax return for its fiscal year ended January 31, 1959. The claimed tentative carryback adjustment was allowed by respondent, and on May 13, 1959, petitioner was refunded $15,015.11 of the amount paid by it as income tax for its fiscal year ended January 31, 1957, plus interest on such refund in the amount of $199.51. Respondent in his notice of deficiency increased petitioner's taxable income as reported for its fiscal year ended January 31, 1959, by the amount of $600,000 shown as "long-term capital gain" with the following explanation: It is determined that you realized a long-term capital gain in the amount of $600,000.00 on the disposition of your interest, during the fiscal year ended January 31, 1959, in 1,000 shares of stock of Bowling Green Wholesale, Incorporated, the computation of which is as follows: Proceds
$700,000.00
Basis of stock
100,000.00
Long-term capital gain realized
$600,000.00
*151 Accordingly, your taxable income is increased in the amount of $600,000.00. Respondent increase petitioner's income for its fiscal year ended January 31, 1957, by the amount of the net operating loss carryback from its fiscal year ended January 31, 1959 to its fiscal year ended January 31, 1957, which had been previously tentatively allowed with the explanation that this carryback loss had been disallowed since it had been determined that petitioner sustained no net operating loss for its taxable year ended January 31, 1959. Opinion Respondent takes the position that in substance the sale of the B. G. Wholesale, Inc., stock by the Foundation was a sale by petitioner and therefore the gain is that of petitioner. However, in accordance with the stipulation of the parties, respondent is not contending for any greater gain than the $600,000 as determined in the notice of deficiency. Respondent's alternative position is that petitioner's transfer of the B. G. Wholesale, Inc., stock to the Foundation, subject to petitioner's loan at the bank, resulted in a gain to petitioner to the extent that the loan exceeded petitioner's basis in the stock. Petitioner maintains that the B. G. *152 Wholesale, Inc., stock was donated to the Foundation on February 28, 1958, to enable the Foundation, which at that time it considered to be an exempt organization, to use the dividends from the stock as a supplement to the cash donations it received to maintain or increase the amount of its contribution to churches and their charitable and educational affiliates. It is petitioner's position that at the time it donated the stock to the Foundation there existed no agreement for the sale of the stock, that the ultimate sale of the stock was negotiated and carried through by the Foundation, and that the gain was that of the Foundation and not of petitioner. Petitioner contends that it realized no income upon the transfer of the stock to the Foundation even though the stock remained pledged with the First American National Bank of Nashville as security for petitioner's loan. Petitioner argues that since it remained liable on the note and the Foundation neither assumed nor ultimately paid the indebtedness for which the stock was pledged, no income could result upon the transfer of the stock subject to the liability. It is petitioner's position that it is immaterial whether in fact the Foundation *153 was an exempt organization at the time the transfer was made since petitioner's belief that it was such an organization was sufficient to show a donative intent on the part of petitioner upon the transfer of the stock and thus cause the transfer to be one which resulted in no gain to petitioner. There are a number of cases dealing with whether gain is taxable to the transferor of property which is sold by the transferee immediately after its transfer. In many of these cases, relying on Commissioner v. Court Holding Company, 324 U.S. 331 (1945), and the numerous cases applying the principle announced therein, the Commissioner contends as he does here that although in form the sale is made by the transferee, in substance it is the sale of the transferor. Where a contract of sale has been negotiated prior to the transfer, the cases generally consider the sale in substance to be that of the transferor. Commissioner v. Court Holding Company, supra; John E. Palmer, 44 T.C. 92 (1965), affirmed per curiam, 354 F. 2d 974 (C.A. 1, 1965); and *154 Harry C. Usher, Sr., 45 T.C. 205 (1965). Where the transferor has entered into negotiations with respect to a sale but no contract of sale has resulted from these negotiations, the sale is generally not considered to be that of the transferor unless other circumstances are such as to indicate a lack of substance in the transaction. Oahu Beach & Country Homes, Ltd., 17 T.C. 1472 (1952), and Sheppard v. United States, 361 F. 2d 972 (Ct. Cls., 1966). From the facts in the instant case, we conclude that although petitioner's officers were aware at the time the stock was transferred to the Foundation that it was quite likely to be sold to Houchens or redeemed by the corporation in the near future, there did not exist any contract for the sale of the stock at the date of its transfer. Under these circumstances, had there been no encumbrance on the stock when it was transferred and were we to conclude that the stock was a bona fide contribution to the Foundation or a dividend to the indirect owner of 87 percent of petitioner's stock, we would agree with petitioner that no gain resulted to it from the transfer. If no encumbrance were on the stock when *155 it was transferred, it would be immaterial in this case whether the transfer of the stock was a contribution or a payment to petitioner's stockholders with respect to their stock since no issue of a claimed deduction for a charitable contribution is here in issue. Cf. Crosby Valve & Gage Co., 46 T.C. 641 (1966), on appeal (C.A. 1, Jan. 1, 1967). If property which has appreciated in value is transferred by a taxpayer to discharge an obligation, such taxpayer realizes a gain from the transfer to the extent that the value of the obligation discharged exceeds his basis in the property. A gift of property that has appreciated in value does not result in income to the donor taxpayer, Humacid Co., 42 T.C. 894, 913 (1964), but where property is donated subject to a mortgage the circumstances of the transfer may be such that a gain does result to the donor. Joseph B. Simon, 32 T.C. 935 (1959), affd. 285 F. 2d 422 (C.A. 3, 1960). Since the amount of the mortgage on property is part of its sale price even though the purchaser does not assume *156 the mortgage, Crane v. Commissioner, 331 U.S. 1 (1947), on the theory that the purchaser will be required in some way to discharge the mortgage, a transfer of property subject to a mortgage may be in substance a receipt by the transferor of the amount of the mortgage on the property if the transferee does in fact pay the indebtedness secured by the mortgage. See Joseph B. Simon, supra. Petitioner contends that in the instant case the Foundation did not in fact pay the note secured by the B. G. Wholesale, Inc., stock which petitioner transferred to it. Petitioner states that it contributed "the stock" to the Foundation and not merely "its equity" in the stock. Even though the resolution passed by petitioner's directors was for a contribution of the stock, all petitioner had any ability to contribute at that time was "its equity" in the stock since the stock was pledged with the bank to secure petitioner's note for $750,000. The stock was assigned to the bank in negotiable form. It could not have been transferred to the Foundation without the agreement of the bank. The Foundation left the stock assigned to the bank to secure petitioner's note. Unless petitioner *157 had either paid the note or put up other collateral satisfactory to the bank which there is no indication in the record it even considered doing at the time of the transfer, the bank would not have temporarily released the stock to permit title to be transferred to the Foundation without the agreement of the Foundation to assign the stock as security for petitioner's note. In substance, accepting petitioner's contention that it made a contribution of the stock to the Foundation in February 1958, all it did contribute was "its equity" in the stock. Petitioner remained the obligor on the note and ultimately petitioner paid the note with funds which came in effect from the sale of the stock. This indirect advance by the Foundation to petitioner with which petitioner paid the note for which the stock was security occurred after the close of petitioner's fiscal year ended January 31, 1959. From the time the title to the stock was transferred by petitioner to the Foundation in February 1958 until March 5, 1959, the Foundation held the stock subject to its assignment to the bank as security for petitioner's loan. After the contract for the redemption of the stock was entered into, the bank *158 continued to hold the stock in assigned form until the note given by G. B. Wholesale, Inc., as part of the redemption price had been paid in full when the bank purchased the B. G. Wholesale, Inc., note from the Foundation and petitioner with $700,000 of the funds from this purchase paid its note for which the stock was security, and the bank transferred the stock from petitioner's account to that of B. G. Wholesale, Inc. The facts show that all the money which the Foundation received from B. G. Wholesale, Inc., in payment for its stock found its way to petitioner and was used by petitioner to discharge its indebtedness to the bank. The first $250,000 of the payment received from B. G. Wholesale, Inc., which is not directly involved in this case, was used by the Foundation to pay a debt to the First National Company, all of the common stock of which the Foundation owned directly and most of the preferred stock of which it owned directly or indirectly. The First National Company used the $250,000 as payment on its indebtedness to four companies, all of the outstanding stock of each of which it owned, which four companies forthwith paid the same amounts on their indebtedness to petitioner. *159 Upon the sale of the B. G. Wholesale, Inc., note which the Foundation received as the remaining portion of the redemption price of the stock, the Foundation advanced $700,000 of the funds received to the First National Company which paid this amount on its indebtedness to three of the same four corporations which then paid petitioner the same amounts on their indebtednesses to petitioner. Petitioner forthwith paid its note to the First American National Bank of Nashville. In substance, the $700,000 which petitioner used to pay the note was part of the redemption price of the stock. The $700,000 was advanced by the Foundation to First National Company which owned all of petitioner's common stock. In form First National Company used the $700,000 to discharge that amount of its indebtednesses to corporations, all the stock of which it owned, and these corporations discharged their indebtednesses to petitioner. In substance the $700,000 was used to pay petitioner's note which was secured by the B. G. Wholesale, Inc., stock. "[By] this roundabout process petitioner received the same benefit" as though the Foundation had directly paid its note. Minnesota Tea Co. v. Helvering, 302 U.S. 609 (1938). *160 The Foundation obtained no more advantage from receipt of the $700,000 than it would have obtained had it directly paid petitioner's note except for having on its books $700,000 as an advance to First National Company. There is no showing in the record that First National Company has or ever intends to repay this advance. We conclude that the intent and plan of petitioner's officers and directors when petitioner transferred the B. G. Wholesale, Inc., stock to the Foundation was that the stock, or proceeds from its sale, would be used to discharge petitioner's note to the First American National Bank of Nashville. Even though petitioner's indebtedness to the bank was not assumed by the Foundation, the Foundation took the stock subject to the indebtedness under such circumstances as to amount to an understanding and agreement that in effect the stock or proceeds from its sale would be used to discharge petitioner's indebtedness to the bank and in effect petitioner sold the stock to the Foundation for the amount of its note which at the time was $750,000. Since the Foundation indirectly owned 87 percent of petitioner's stock, petitioner's transfer of the stock to the Foundation might *161 be considered to be in the nature of a dividend. Section 311(a) of the Internal Revenue Code of 1954[1] codifies the generally accepted law under the 1939 Code, that a corporation realizes no gain or loss upon the distribution of property with respect to its stock. However, one of the exceptions to this general rule is contained in section 311(c)[2] which provides that if a corporation distributes property to a shareholder with respect to its stock, such property is subject to a liability and the amount of such liability exceeds the adjusted basis of such property in the hands of the distributing corporation, gain shall be recognized to the distributing corporation in an amount equal to such excess as if the property distributed had been sold at the time of the distribution. *162 If petitioner's transfer of its stock to the Foundation were considered to be in substance a distribution of a dividend to the indirect owner of 87 percent of its stock as distinguished from a contribution, the language of the Statute would require the recognition of a capital gain at least to the extent determined by respondent. Petitioner's contention that the stock was transferred to the Foundation to enable the Foundation to receive dividends is unimpressive since the clear inference from the record is that petitioner's management was aware of the likelihood of the stock being disposed of in the near future if the owner of the stock insisted on reasonably high dividends. The lack of any intention to assist the corporation, at least to the extent of the amount of petitioner's note for which the B. G. Wholesale, Inc., stock was security, is indicated by the immediate advance of $700,000 of the funds the Foundation received upon the sale of the B. G. Wholesale, Inc., note to the bank to First National Company from which the $700,000 found its way to pay petitioner's note. The same day the Foundation sold the B. G. Wholesale, Inc., note to the bank, petitioner's note to the same *163 bank was paid by a portion of the funds from the sale. We agree with respondent that the substance of the transaction whereby petitioner transferred the stock to the Foundation was a sale by petitioner of the stock for an amount of at least $700,000. We therefore sustain respondent's determination that petitioner realized a capital gain in this amount from the transfer of the B. G. Wholesale, Inc., stock to the Foundation in its fiscal year ended January 31, 1959. Decision will be entered for respondent. Footnotes
1. SEC. 311. TAXABILITY OF CORPORATION ON DISTRIBUTION. (a) General Rule. - Except as provided in subsections (b) and (c) of this section and section 453(d), no gain or loss shall be recognized to a corporation on the distribution, with respect to its stock, of - (1) its stock (or rights to acquire its stock), or (2) property. ↩
2. Sec. 311(c) Liability in Excess of Basis. - If - (1) a corporation distributes property to a shareholder with respect to its stock, (2) such property is subject to a liability, or the shareholder assumes a liability of the corporation in connection with the distribution, and (3) the amount of such liability exceeds the adjusted basis (in the hands of the distributing corporation) of such property, then gain shall be recognized to the distributing corporation in an amount equal to such excess as if the property distributed had been sold at the time of the distribution. In the case of a distribution of property subject to a liability which is not assumed by the shareholder, the amount of gain to be recognized under the preceding sentence shall not exceed the excess, if any, of the fair market value of such property over its adjusted basis.↩